Filed 2/26/21  P. v. Weissman CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN IRVING WEISSMAN,<br><br>    Defendant and Appellant. | H045863<br>(Santa Cruz County<br>Super. Ct. No. F25241) |

A jury found that defendant Steven Irving Weissman had sexually molested six young boys over a period of more than 15 years.  He was convicted of 12 counts of lewd act on a child under 14 (Pen. Code, § 288, subd. (a)),[1] one count of lewd act on a child of 14 or 15 (§ 288, subd. (c)), and one count of aggravated sexual assault on a child (§ 269, subd. (a)(4)), and the jury also found true a multiple victims allegation (§ 667.61, subds. (b), (c)(8), (e)(4)) as to the counts of lewd act on a child under 14.[2]  The trial court

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Two additional lewd act counts and an indecent exposure count were dismissed before the case was submitted to the jury.  The jury returned guilty verdicts on the remaining counts except that it deadlocked on one additional lewd act count and acquitted defendant of another additional lewd act count that involved a seventh alleged victim.  The prosecution dismissed the deadlocked count.  An oral copulation of a child (§ 288.7, subd. (b)) count concerning a 1998 act, which was an alternative to the aggravated sexual assault count, was dismissed on ex post facto grounds after the jury's verdicts.  Section 288.7 was first enacted in 2006.  (Stats. 2006, ch. 337, § 9.)

denied defendant's new trial motion and sentenced defendant to prison for 105 years 8 months to life.[3]

On appeal, he contends: (1) most of the counts are not supported by substantial evidence of sexual intent, (2) the prosecutor misdescribed the sexual intent element to the jury, (3) the prosecutor violated defendant's constitutional rights when he contacted an excused juror before closing arguments, (4) the prosecutor committed prejudicial misconduct by "vouching" for some of the victims during closing arguments, (5) the prosecutor prejudicially violated defendant's due process rights by failing to correct false testimony by one of the victims, (6) the prosecutor failed to comply with his obligation to disclose that an employee of the district attorney's office had given gifts to one of the victims and that the same victim had been arrested, (7) defendant's trial counsel was prejudicially deficient in failing to object to the prosecutor's elicitation of evidence that defendant lacked any heterosexual relationships, (8) defendant's trial counsel was prejudicially deficient in failing to object to the prosecutor and witnesses characterizing defendant as a "pedophile," (9) defendant's trial counsel was prejudicially deficient in failing to present impeachment evidence, (10) the trial court prejudicially erred in instructing the jury that a witness's degree of certainty was relevant in evaluating the witness's identification testimony,[4] (12) errors were cumulatively prejudicial, and (13) the jury's finding on the multiple victims circumstance under the one-strike law cannot be upheld because the trial court failed to instruct on it and, as to those counts that predated the September 2006 amendment of the one-strike law, the jury's findings violated the prohibition on ex post facto laws.

---

[3] The sentence was composed of 15-years-to-life terms for all counts except for the lewd act on a child of 14 or 15, for which the court imposed an eight-month term.

[4] This issue is currently before the California Supreme Court in *People v. Lemcke* (S250108).

We find that the prosecutor's prejudicial failure to correct false testimony requires reversal of nine of the counts. We reject defendant's other claims and remand the matter with directions to give the prosecutor the option to either retry those counts or proceed to resentencing on the remaining five counts.

## I. THE PROSECUTION'S CASE

### A. *Victim K.C.* (*Aggravated Sexual Assault* (*Count 7*) *and Lewd Act* (*Count 9*)); *1997-1998*)

K.C. was born in 1988. Defendant was a yard duty supervisor at K.C.'s elementary school. K.C. became friends with defendant's adopted son, Charlie Weissman.[5] K.C. was invited to go with Charlie and defendant to "see a movie that had just come out called The Borrowers." Defendant sat between K.C. and Charlie during the movie, which K.C. thought "strange."

The following week, defendant invited K.C. to defendant's home to play with Charlie. At defendant's home, defendant took K.C. to see defendant's snakes in his garage. After they had looked at the snakes for a while, defendant said to K.C: "I want to see your weiner." Defendant unbuttoned and unzipped K.C.'s pants and pulled them down. Defendant then pulled down his own pants and pulled his penis and testicles out of his underwear. He told K.C. to open his mouth, and defendant forced his penis into K.C.'s mouth. K.C. tried to pull away, but defendant overcame his resistance and told him to "suck it like a lollipop." K.C. continued to resist, and he was able, after about 20 seconds, to push defendant away. Defendant told K.C. to pull up his pants, and he said "that I was being a bad boy and not to tell anybody . . . ."

---

[5] Charlie testified that he did not know K.C., had not been in any class with him, had never had K.C. over to his house, and had never gone to a movie with K.C. and defendant.

3

K.C. felt "afraid and ashamed." He thought if he told anyone he would be punished for having done something wrong. K.C. avoided defendant and Charlie after this incident.

K.C. did not tell anyone about this incident until 2007 when he was 18 years old. The first time he told anyone anything about it was when he and his close friend, Daniel C., had taken LSD and K.C. had drunk some whiskey. The LSD did not cause K.C. to have hallucinations, but it "made me feel a little bit loose I guess." K.C. cried and told Daniel that when he was "a little boy" a "neighbor" who "would watch him from time to time" "hurt him." K.C. did not tell Daniel anything else about the incident. K.C. "had a great sense of relief" after this disclosure.

Not long after telling Daniel, K.C. told his then-girlfriend. A couple of years later, K.C. told his mother that defendant had molested him. K.C. also told two subsequent girlfriends and his father. K.C. was drunk when he told his mother and when he told his father. K.C. told another girlfriend in 2009, but he did not identify the perpetrator.

K.C. did not want to tell the police because he did not want to relive the experience or go into a courtroom. However, after K.C. heard that defendant had been arrested in 2013 for molesting another child, he felt that he needed to come forward. When K.C. first talked to the police, he did not mention the LSD because he was afraid he would get in trouble.

### B. Victim R.A. (*Lewd Act (Count 20); 2003-2006*)

R.A. was born in 1991. When he was eight or nine years old, R.A. became friends with Charlie. Defendant was a yard duty supervisor at the elementary school that R.A. and Charlie attended. Charlie invited R.A. to his home, and R.A. came over and played with Charlie. R.A. sometimes helped defendant with his snakes.

On one occasion, after R.A. told defendant that his back hurt and was stiff, defendant asked R.A. if he wanted defendant to "crack" R.A.'s back. R.A. said "okay," so defendant had R.A. sit on his lap facing away from him. R.A.'s buttocks was pressed

4

against defendant's groin. Defendant grabbed R.A.'s arms and then his knees and rocked back and forth three times. R.A. thought this was "kind of weird" and "wiggled" away. It did not help his back.

About a year later, when R.A. was 12 or 13 years old, R.A. spent the night at defendant's home. In the night, R.A. wandered into the master bedroom where defendant was using his computer. R.A. asked defendant about the Tempurpedic bed, and defendant invited him to lie down on it. R.A. fell asleep on the bed for 10 or 15 minutes and awoke to find defendant lying "right behind" him and "spooning" him. Defendant's body was in contact with R.A.'s body from defendant's chest to defendant's knees. R.A. could feel defendant's erect penis poking him. When defendant realized R.A. was awake, he immediately got up.

### C. Victim S. (3 counts of Lewd Act (Counts 16, 17, and 18); 2005-2008)

S. was born in 1997.[6] Defendant was a yard duty supervisor at S.'s elementary school, and S. met defendant in 2005 when S. was eight years old and in third grade. Like some of the other boys defendant abused, S. lived with his mother, and his father was no longer involved in his life. S. saw defendant as a "father figure." Defendant told S. that he had previously been married, which was not true. Defendant invited S. to his home to help him with his snakes. S. started coming over to defendant's home three or four times a week.

S. and defendant would greet each other with "[l]ong-lasting deep hugs." One time, defendant gave S. "a quick kiss" on the lips after giving him a hug. S. did not see defendant hug other boys. S. sometimes sat in defendant's lap. S. would "[h]ang out" and watch television at defendant's home, and go places and "get food" with defendant.

S. began spending the night at defendant's home in 2005 after they had known each other for a couple of months. The first time S. spent the night at defendant's home,

---

[6] S.'s last initial is not in the record.

defendant offered eight-year-old S. a sleeping pill. Although defendant offered sleeping pills many other times, S. only sometimes took them. S. and defendant always "would sleep in the same bed together" when S. spent the night.

Sometimes defendant gave S. massages in the bed, during which he massaged S.'s back and legs, but not his buttocks. The massages happened two or three times a week for three years. Over time, S. noticed that defendant made "inappropriate jokes" about women's bodies and "talk[ed] about sex," "heterosexual talk." Defendant also told S. 20 times that he wanted S. to get circumcised. He told S. that his penis would "stay small and it would never grow to full size" if he did not get circumcised.

When the two of them watched television, they would sit next to each other and "kind of snuggle." Defendant frequently rubbed S.'s legs "[s]ensually," including his thighs.[7] During a trip with two other boys, S. saw defendant pull down the sheets covering the other two boys and take photos of them as they slept.

In the fall of 2007, one of defendant's fellow yard duty supervisors heard S. conversing with defendant. Defendant asked S. " 'Do you plan on spending the night at my house?' " S. responded: " 'Yes, if you don't get drunk.' " She reported this conversation to the principal, who contacted child protective services (CPS). The principal terminated defendant without giving a reason, and defendant became very upset. He continued to come to the school to pick up S.

In 2008, S. found a "spy camera" hidden in a radio in the bathroom at defendant's house. The camera was aimed at the toilet and the shower, which had a clear shower curtain. S. discovered that the camera was linked to defendant's television. S. considered that "it was just the last straw, where I realized that he is a pedophile." About two weeks later, he told his mother about the camera "and that I was pretty sure that he

---

[7] S. denied that his trial testimony was the first time that he had used the word "sensual."

6

was a pedophile." However, he did not provide her with any information about the interactions between him and defendant. S.'s mother confronted defendant, and defendant admitted that there was a camera in the bathroom.

S.'s relationship with defendant ended in 2008. After defendant was arrested, S. did not want to come forward, even after the police tried to contact him, because he felt "incredibly guilty" and did not want to talk about it. He testified at trial "under subpoena" and did not "really want to be here."

### D. Victim T.B. (*Two counts of Lewd Act* (*Counts 12 and 13*); *2013*)

T.B. was born in 2003. His mother physically abused him, beating him with shoes, belts, and other objects. When he was two or three years old, T.B.'s mother was giving him a bath and washed his penis with her hand in a way that made him "uncomfortable." There was nothing "sexual" about the incident.[8] He pushed her hand away and said "No." T.B. developed "anger problems" arising from his mother's physical abuse.

While he was living with his mother, T.B. was hearing voices and "seeing things that weren't there." He "would see like dead people on walls." T.B. was half aware that the things he was seeing and hearing were not real. In 2010 or 2011, T.B. stopped living with his mother and went to live in a group home and then with his father and stepmother. He did not see or hear things that were not there while he was living with his father or thereafter. Unfortunately, his inability to control his anger made it impossible for him to continue living with his father. His father had to call the police and have him removed in late 2011. T.B. was placed in hospitals and mental hospitals for some time and prescribed medications to help stabilize him. T.B.'s medications included a "mood

---

[8] On cross-examination, T. testified that he originally thought his mother's touching of his penis was sexual but then realized that it was not.

7

stabilizer," another medication "to keep me calm," a medication for "the voices I used to hear in my head," and another "to help me go to sleep."

On June 10, 2013, 10-year-old T.B. came from a mental hospital to stay at defendant's house as a foster placement. T.B. was not having any problems with hearing voices or seeing things that were not real while he was at defendant's home or when he was at the mental hospital before going to defendant's home. T.B. slept in the guest room at defendant's home, but he used the bathroom in the master bedroom because the other upstairs bathroom was devoted to defendant's cats' litter box. The master bathroom had no door, so defendant could see T.B. when he was using that bathroom.

When T.B. went to sleep in the guest bedroom, he would close the door and cover himself with the blankets.[9] However, sometimes he would wake up and find the door open or the blankets removed. This happened three or four times. One night a few days after he arrived at defendant's home, about 45 minutes after he went to bed, while he was only partway asleep, he heard the door open and felt someone sit down on the foot of his bed and pull down his blankets. T.B. stretched his legs, and his leg hit another person's body. He then felt a person put a hand inside his underwear and start rubbing his penis. Although T.B. could not see the person's face in the dark, the only other person in the house was defendant. The rubbing continued for three or four minutes. T.B. was afraid to open his eyes, but he eventually opened his eyes and moved around, which caused the person to get up, look around the room, and then leave.

A similar event happened on another night, but this time defendant looked around T.B.'s room before he sat down on T's bed. Defendant seemed to be mumbling, and, when he sat on the bed, "it sounded like he was talking to someone," though there was no

---

[9] T. testified that in June it was hot in Santa Cruz, but "the AC was on at night, and it got cold in the house."

one else in the room besides T.B. The touching of his penis was shorter the second time because T.B. moved around more quickly.[10]

Three days after T.B. arrived at defendant's home, a seven-day notice for change of placement was given by either defendant or the agency that had placed T.B. in defendant's home. T.B. was removed from defendant's home on June 20, 2013, after being there for 10 days. T.B. was interviewed by CPS on August 20, 2013 and asked if defendant had touched him. T.B. said no because he was too scared and embarrassed to talk about it. T.B. also told his father that defendant had not touched him.

At some point, T.B. saw on the news that defendant had been arrested and charged with sexual molestation. He started having "flashbacks" and "dreams" about defendant molesting him. About six months later, T.B. told his social worker, a woman he trusted, that defendant had molested him. He later made a videotaped statement to an investigator in Modesto, and after that spoke to the prosecutor and his investigator about the molestations.

### E.      *Victim A.* (*Two counts of Lewd Act* (*Counts 10 and 11*); *2013*)

A. was born in 2004.[11] A.'s mother enrolled A. in the Big Brothers Big Sisters program, and defendant was assigned to be A.'s Big Brother in May 2013. Defendant and nine-year-old A. met once a week, usually at defendant's house. After a couple of months of these visits, defendant asked if A. could spend the night at his house on July 30, 2013. A.'s mother agreed, and A. spent that night at defendant's house.

When A. was getting ready to go to sleep that night, defendant said he would give A. a massage. Defendant gave A. a massage on the middle of his back over his pajamas and the blankets. Afterwards, defendant got off the bed and tapped A.'s back and butt

---

[10] Although T.B. thought there were one to three additional times that defendant touched T.B.'s penis, he could not remember those events.

[11] A.'s last initial is not in the record.

lightly.  A few days later, A.'s mother learned that defendant had been "accused of doing something he wasn't supposed to with kids."  A.'s mother asked A. if defendant had touched him when he spent the night, and A. confirmed that defendant had touched him.

### F.      Victim J.K. (*Three counts of Lewd Act* (*Counts 1, 2, and 3*); *and one count of Lewd Act on a Child of 14 or 15* (*Count 5*) (*2008-2013*)

J.K. was born in 1999.  In 2008, when he was eight years old, he and his mother were "very poor," and his mother "was working all . . . the time."  J.K. had never met his father.  Defendant was living in the same neighborhood as J.K., and J.K. met defendant through another young boy named "Sam" who knew defendant.  When J.K. was nine or 10 years old, defendant offered to take J.K. and Sam to the Boardwalk, and they went.  Afterwards, defendant took J.K. to defendant's house to see his snakes.

Within a month or so, defendant began paying J.K. to help him with his snakes.  J.K. started spending a lot of time at defendant's home, watching television and eating, and sleeping over, and defendant would also take J.K. to the movies and to "the pool."  J.K. did not like being at his own home because his mother "was always really angry and there wasn't enough food."  J.K. saw defendant as "like a father figure."

At some point early on in the relationship between J.K. and defendant, J.K.'s mother became suspicious that defendant was "a pedophile" after she received an anonymous telephone call, but she eventually decided that it was okay for J.K. to continue to spend time with defendant.  J.K. understood "pedophile" to mean someone who was "sexual towards a child."

Defendant customarily hugged J.K. when he arrived and when he left defendant's home.  There was nothing sexual about these hugs.  Defendant also hugged his friends and relatives when they arrived and left.   Defendant also had other physical contact with J.K.  Three times, when they were watching television, J.K. sat on defendant's lap.  Defendant at times would kiss J.K. on the forehead when he left the house.  J.K. had a lot

10

of back pain, and defendant often massaged J.K.'s upper back (a few times a month) when J.K. was in middle school.

After a while, defendant began to "pressure" J.K. to spend more time at defendant's home and to spend the night more often. Defendant took J.K. and others on "trips to the desert," and he bought J.K. an iPod and a computer. When J.K. was in eighth grade, defendant told him that he would buy him a new wetsuit if he would spend the night once a week. Defendant controlled J.K.'s cellphone account and once cut off J.K.'s cellphone because he was upset at J.K. Defendant told J.K. that he had $3 million, that he would pay for J.K.'s college, and that his will would leave J.K. $1.5 million.

J.K. usually slept in the master bedroom of defendant's home, and defendant "was supposed to sleep downstairs." Sometimes J.K. woke up and found defendant sleeping in the same bed with him. J.K. told him not to do that, but it continued. About 10 times a year, J.K. would find defendant in bed with him. A few times J.K. was awake at 3:00 a.m., and defendant gave him "a piece of a sleeping pill" and told him to take it.

In 2011, when J.K. was in sixth grade, he awoke in the middle of the night to find defendant "trying to get my penis out of my pajama . . . pants . . . ." Defendant did not actually touch J.K.'s penis.[12] J.K. "yelled at him saying I'm leaving in the morning and that he's a pedophile . . . ." However, he continued his relationship with defendant. J.K. tried to block this event out of his memory because he could not accept that he "had been spending the night at a pedophile's house . . . ."

In 2012, J.K. turned on a television in defendant's bedroom and saw a camera that was showing a toilet. Defendant saw him make this discovery and told him that he "didn't see anything." J.K. stopped coming to defendant's home for a while, but he then resumed coming there. In late July 2013, J.K. told his doctor about defendant, and his

---

[12] The jury deadlocked on the count associated with this conduct.

11

doctor warned him to be "really careful" and be "looking out for red flags."[13] J.K. understood the red flags to be "[a]bout him being a pedophile."

In early August 2013, the day before J.K.'s 14th birthday, defendant had some friends over to play poker. After the friends left, defendant was "acting really weird to me" and "kind of creepy." Defendant was not a big drinker, but that night he had had several alcoholic drinks. Defendant told J.K. to go to bed, and J.K. did so. J.K. covered himself with a sheet and two blankets, but he stayed awake with his eyes closed to see "what happens."

J.K. was still awake but with his eyes closed when, around 3:30 a.m., defendant came into the bedroom, turned on the lights, and then moved around the bedroom for a while. After doing so, he moved J.K.'s blanket down "to just above waist level," and moved J.K.'s arm off of his chest. Right after doing so, defendant got into the bed next to J.K., pulled a sheet up over himself, and started masturbating about a foot away from J.K. J.K. heard the sounds of defendant masturbating, looked over at defendant, and saw defendant staring at him. J.K. jumped out of the bed, pulled down the sheet, and saw defendant's partially erect penis protruding from his boxers. Defendant tried to cover himself with his hands. J.K. asked defendant what he was doing. Defendant denied doing anything, but he stood up and a used condom fell out of his hand. J.K. ran out of the house, went home, and immediately told his mother what had happened. J.K. told his mother "Steve is a pedophile."

J.K. was interviewed by law enforcement later that day. Part of his motivation for reporting defendant's conduct was that he knew that defendant was a "Big Brother" to A. J.K. told law enforcement that defendant was drunk the previous night, and he explained that he believed that "people who are pedophiles . . . repress it" and it "comes out more"

---

[13] J.K.'s doctor testified at trial and confirmed that he had warned J.K. about expensive gifts from an older man. He had asked J.K. if he had been sexually touched, and J.K. had denied that he had been.

12

when "they drink." "[H]e was acting weird cause he was drunk." Over the next couple of days, J.K. was interviewed twice more about his relationship with defendant.[14] He told the police what he could remember, but he said "I keep remembering more." He did not tell the police about the 2011 pajama incident and denied to them that there had been any touchings before August 2013.

J.K. testified at trial that he did not tell the police about the pajama incident or the camera incident because he "thought it would make me sound dumb, if I stayed around there after that." He first disclosed those incidents a week before trial, on August 4, 2016. He told the prosecutor and his investigator that he had just remembered those incidents a month earlier. J.K. had considered filing a lawsuit against defendant "for emotional damages." "I deserved some money. This ruined my life." J.K. did not know K.C. or R.A., but he had met T.B. when T.B. was at defendant's home. J.K. had also seen S. once at defendant's house.

### G.    Other Prosecution Evidence

Defendant's computers were seized by the police on August 5, 2013. Condoms were found in defendant's bathroom. A forensic search of defendant's computers did not turn up any child pornography. The computers were also searched for any instance of the word pedophile or pedophilia. J.K. had a user account on one of the computers, which appeared to be a computer devoted to "gaming." That computer had no mention of pedophile or pedophilia.

The other computer had only one user account, named "Steve." On that computer, the forensic search turned up a Google search for "pedophiles" from March 8, 2013. Similar searches had occurred on that computer on March 10 and March 13, 2013 for "pedophile." The forensic search also found four articles on that computer's hard drive that contained the term "pedophile." One of the articles appeared on the hard drive on

---

[14] These interviews were recorded and played for the jury at trial.

May 31, 2013.  Three other articles appeared on the hard drive on July 31, 2013, and they all concerned pedophilia.  In the "unallocated space" on the computer, there were several additional references to pedophilia.  The presence of these articles and other references showed only that someone had clicked on a link to that material.  There was no indication of whether the computer was password protected.

Ellen Buckingham, a former neighbor of defendant, testified that her son had gotten to know defendant and had begun spending time at defendant's home in the mid-1980s.  Her son started spending the night at defendant's home when her son was 10 years old.  Once, when defendant's parents were visiting, defendant asked Buckingham to masquerade as his girlfriend to "appease" his parents, who "were concerned he didn't have a girlfriend."  She did so.  Buckingham's son spent the night at defendant's home a number of times, but Buckingham eventually limited and then cut off contact between her son and defendant because she learned that her son and defendant were sleeping in the same bed.  Defendant was angered by her restrictions, and she ultimately had to get a restraining order against him.[15]

Sibylle Peters was defendant's friend and housecleaner.  They remained friends for 18 years, and she continued to clean his house throughout that period.  They never had a romantic relationship.  Her son became friends with Charlie, and this led to her son spending the night at defendant's home frequently beginning sometime around 1998.  After defendant was arrested, he told Peters that he "was freaked out that he made a mistake."  He told her that he "was drinking, and J[.K.] was on the bed already, and he was jacking off."

---

[15] In 1993, 1996, and 1997, defendant violated the restraining order by harassing Buckingham.

14

Defendant was interviewed by the Sheriff's Office on August 5, 2013.  He was asked if he was in a relationship, and he said he was in a relationship with Peters, though it was "not really serious."

## II.     THE DEFENSE CASE

A defense expert testified about the effects of LSD and alcohol.  He opined that LSD "distorts" memory.  When LSD is combined with alcohol, "[i]t makes memories even more questionable."  LSD can produce "false memories" while the user is under the influence of the drug.  These are largely false memories of the time spent on LSD, including altered perceptions, though LSD could distort memories of the past at least while the user is on LSD.  When a user does not experience visual distortions, that probably means that the dosage was low.  A low dosage is less likely to distort memory.  LSD users generally are aware afterward that their altered perceptions were not accurate.  LSD does not affect the "retrieval of memor[ies]" from a time prior to the use of LSD.

Buckingham's son, D.B., who was born in 1979, testified for the defense.  D.B. testified that he "kind of latched onto [defendant] as a father figure" when D.B. was a boy and defendant was his neighbor.  D.B. believed that his mother and defendant were dating.  D.B. continued to "hang out" with defendant even after they were no longer neighbors.  He spent the night at defendant's home many times, and he sometimes slept in the same bed with defendant.  D.B. saw other adults, both male and female, at defendant's house regularly.  Defendant never touched D.B. inappropriately.

Richard Martinez, who was born in 1969, testified that he met defendant when he was 13 or 14 years old and defendant was in his 20s.  Martinez frequently visited defendant's home in the 1980s and 1990s.  Defendant never touched him inappropriately.  Martinez saw defendant less frequently after the early 1990s, and he last saw defendant in 2011.  Several other boys who had spent the night at defendant's home testified that he had never touched them inappropriately.

Leslie Karst testified that she met defendant when they were in college at the University of California at Santa Cruz. She and defendant remained friends with each other thereafter and with numerous other college friends. Karst had visited defendant's home on average about twice a month from 1990 until his arrest. She had never seen defendant touch a child inappropriately.

## III.    DISCUSSION

### A.    *Substantial Evidence*

Defendant contends that there was insufficient evidence of sexual intent to support his convictions on counts 1, 2, 3, 10, 11, 16, 17, and 18. These counts involved three of defendant's six victims. Counts 1, 2, and 3 were based on defendant massaging and hugging J.K. and having J.K. sit on his lap. Counts 10 and 11 were based on defendant massaging and tapping the bottom of A. Counts 16, 17, and 18 were based on defendant hugging, kissing, snuggling, and massaging S. Defendant argues that there was no evidence that he harbored a "sexual intent" when he engaged in these acts. He acknowledges that the jury was entitled to consider "surrounding circumstances and rely on them to draw inferences about his intent," but he insists that there was no evidence that he engaged in these acts "for sexual gratification."

"Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "[T]he standard of review that applies to insufficient evidence claims involving circumstantial evidence is the same as the standard of review that applies to claims involving direct evidence. 'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" . . . Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

16

The specific intent element of a lewd act offense requires proof that the defendant touched the child "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." (§ 288, subd. (a).) "[A] 'touching' of the victim is required, and . . . sexual gratification must be presently intended at the time such 'touching' occurs. [Citations.] However, the form, manner, or nature of the offending act is not otherwise restricted. . . . [A] lewd or lascivious act can occur through the victim's clothing and can involve 'any part' of the victim's body." (*People v. Martinez* (1995) 11 Cal.4th 434, 444.) "[A]*ny* touching of an underage child is 'lewd or lascivious' within the meaning of section 288 where it is committed for the purpose of sexual arousal." (*Id.* at p. 445.) "[T]he touching of an underage child is 'lewd or lascivious' and 'lewdly' performed depending entirely upon the sexual motivation and intent with which it is committed." (*Id.* at p. 449.) "[T]he lewd character of an activity cannot logically be determined separate and apart from the perpetrator's intent. It is common knowledge that children are routinely cuddled, disrobed, stroked, examined, and groomed as part of a normal and healthy upbringing. On the other hand, any of these intimate acts may also be undertaken for the purpose of sexual arousal. Thus, depending upon the actor's motivation, innocent or sexual, such behavior may fall within or without the protective purposes of section 288." (*Id.* at p. 450.)

Defendant argues that there was no evidence that "any single hug, any particular massage, or any instance of a child sitting on [defendant]'s lap was done for sexual gratification." He asserts that "[t]here was no evidence that [defendant] was aroused during any of the massages, hugs, or when the children were sitting on his lap. Also, there was no evidence that [defendant] had any sexual fetish for hugging or massaging children or having them sit on his lap."[16]

---

[16] Defendant inaccurately claims that the prosecutor "did not dispute that many of the massages, hugs and sitting on [defendant]'s lap were done with innocent intent or appropriate affection of a foster parent." In fact, the prosecutor simply conceded, after

17

Defendant puts misplaced reliance on two elderly cases. In *People v. Perkins* (1982) 129 Cal.App.3d 15 (*Perkins*), the defendant was convicted of both lewd act on a child and unlawful sexual intercourse with a minor. (*Id*. at pp. 17-18.) He had first put his arm around the young girl, and he later had sex with her. The court imposed a prison term for the lewd act count and stayed under section 654 sentence for the unlawful sexual intercourse count. (*Perkins*, *supra*, at p. 18.) On appeal, the defendant contended that he could not suffer a "separate conviction" for the lewd act count because it was "based upon an act which was preparatory to" the unlawful sexual intercourse. (*Ibid*.) The Court of Appeal agreed with the defendant's argument that the lewd act was "not a separate offense from the unlawful sexual intercourse" but affirmed the judgment because, in its view, the section 654 stay "cured" the problem. (*Perkins*, *supra*, at p. 18.)

The *Perkins* opinion, while not a substantial evidence case, does contain some language that defendant cites as support for his argument that a *preparatory act* does not violate section 288. However, the holding in *Perkins* was limited to the court's conclusion that the defendant could not be *punished* for both the section 288 offense and the section 261.5 offense. That holding is not relevant to defendant's substantial evidence challenge.

The other case defendant relies on is even more elderly and no more helpful. In *People v. Webb* (1958) 158 Cal.App.2d 537 (*Webb*), the defendant put his arm around a young boy's shoulder and led him into a restroom, where the defendant forced the boy to orally copulate him. (*Id*. at p. 539.) He claimed on appeal that he could not be convicted of both a lewd act count and an oral copulation count for the same act. (*Id*. at p. 540.) The Attorney General argued that the two offenses were based on separate acts, with the lewd act count being based on the defendant putting his arm around the boy's

---

the trial, that "[m]any of the touchings by [defendant] could be open to interpretation." In other words, whether these touchings were lewd acts within the meaning of the statute depended on the circumstantial evidence of defendant's intent.

shoulder. (*Id*. at p. 542.) The Court of Appeal reasoned that "[r]egardless of any intent [that] defendant might have had" when he put his arm around the boy's shoulder, "that act" did not come within the meaning of section 288 because it was not "lewd." (*Webb*, *supra*, at p. 542.) This aspect of the *Webb* court's analysis plainly conflicts with the California Supreme Court's analysis in *Martinez*, several decades later, so defendant's reliance on it is inapt.

The circumstantial evidence that defendant had a sexual interest in young boys and that he pursued contact with them for sexual gratification was sufficient to support a reasonable inference that when defendant massaged, hugged, kissed, and snuggled these boys, had a boy sit on his lap, and touched a boy's buttocks, he did so for sexual gratification. The jury could have reasonably drawn this inference based on evidence that he engaged in other touchings of some of these boys and other boys under similar circumstances with more obvious sexual intent. For instance, the fact that he had an erection when he spooned R.A. and that he masturbated as he looked at J.K. supported a reasonable inference that his massages, huggings, kissings, snugglings, and other potentially innocuous conduct were sexually motivated. Defendant's argument ignores the fact that the jury was entitled to draw reasonable inferences from defendant's *other* more clearly sexually motivated acts. We reject his claim that the evidence was insufficient to support the jury's findings that he harbored the requisite intent when he committed these acts.[17]

---

[17] While defendant alludes to other claims in the section of his brief addressing sufficiency of the evidence, they do not merit any analysis. The California Rules of Court require an appellant to "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B), 8.360(a).) Under the sufficiency of the evidence heading in his opening brief, defendant mentions (but does not develop) a claim that the prosecutor was required to make an "election" as to which specific act formed the basis for each count and seems to suggest that a unanimity instruction might have been required. He mentions this assertion again, this time with a subheading, in his

### B.      Prosecutor's Description of Sexual Intent Element

Defendant claims that the prosecutor "repeatedly misstated the law regarding the element of the union of the act of touching and sexual intent." He asserts that the prosecutor improperly argued that "concurrent sexual intent" was not necessary.

The trial court accurately instructed the jury on the required union of intent and act. "For you to find a person guilty of the crimes in this case, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and mental state." "The crimes charged in this case require the proof of a union or joint operation of act and wrongful intent. [¶] For you to find a person guilty of the crimes in this case, that person must not only intentionally commit the prohibited act, but must do so with the specific intent and mental state." The court told the jury that the prosecution was required to prove that "the defendant committed the act with the intent of arousing or appealing to or gratifying the lust, passions, or sexual desires of himself or the child." And the court instructed the jury: "You must follow the law as I explain it to you, even if you disagree with it. [¶] If you believe that the attorney's comments on the law conflict with my instructions, you must follow my instructions."

Defendant's argument is based on two statements made by the prosecutor. The prosecutor told the jury that "the touching doesn't have to be sexual" and that "[t]he touching itself can be set up, grooming, getting a child ready for levels of physical contact. As long as it's coupled with a sexual purpose, that is sufficient."

Context matters. The two statements that defendant attacks were not inconsistent with the trial court's instructions, especially when we consider that these two statements were *immediately preceded* by the prosecutor's explicit acknowledgement that he was required to prove a "*combination* of touch and intent." (Italics added.) And the

---

reply brief, but again without developing it. It is improper to raise a new argument in a reply brief. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 642). Since defendant has not properly raised these possible claims, we do not address them.

challenged statements were *immediately followed* by the prosecutor's statement that "[a]s long as it's *coupled with* a sexual purpose, that is sufficient," again expressly acknowledging the "union" requirement.  (Italics added.)  And the prosecutor went on to tell the jury:  "That touching has to be motivated by his sexual desires.  It has to be done with the intent to appeal or gratify his desires."

The context of the prosecutor's remarks fully rebuts defendant's claim that "the prosecutor's argument that the touching does not have to be sexual, and that a grooming touching done in anticipation of a *future* sexual act violates § 288 . . . is contrary to settled law."  Taken in context, it is clear that the prosecutor did *not* argue that a touching "in anticipation of a future sexual act" would satisfy the intent requirement.  At every point, the prosecutor's argument confirmed that the required touching and the required intent had to be in "combination" or "coupled with" one another in order to satisfy the statute.  While the prosecutor did argue that a touching could be a "set up" for a subsequent sexual *act*, he consistently told the jury that the *touching* and the sexual *intent* were required to be "coupled," which is consistent with the requirement that there be a "union" of the act and the intent.  Thus, the prosecutor did not misdescribe the sexual intent element of a lewd act offense.

### C. *Prosecutor's Contact with Excused Juror No. 1*

Defendant argues that the prosecutor's contact with an excused juror between the close of evidence and closing arguments violated his constitutional rights and requires reversal.  While we agree with the trial court that the prosecutor's conduct was improper, we also agree with the trial court that the misconduct was not prejudicial and therefore does not merit reversal in this case.

#### 1. *Background*

Karst was a defense witness.  She and defendant had been friends since they met in college.  Karst testified that defendant had remained friends with a number of men and women from college.  She also testified that defendant had lived with a girlfriend named

21

Mabel after college for a few years. After defendant and Mabel broke up, defendant was "devastated" and "very upset." Karst had seen defendant look at women with large breasts. Karst testified that defendant "is definitely a hugger," and he was known to kiss his friends on the lips. On a trip to Palm Springs, Karst had shared a bed with defendant even though Karst, who is a lesbian, was not romantically involved with defendant. Karst testified that she had never seen defendant touch a child inappropriately.

A juror submitted a question to the court, apparently during Karst's testimony. It read: "Is Leslie K[a]rst's wife in court today? [¶] If so has she been listening to other witness's testimony? [¶] Does she know the other people in the court? [¶] If so have they spoken together?"

On cross-examination, Karst testified that she had talked to defendant and "the defense team" about the case. She had also talked to Martinez about the case. Karst admitted that she wanted to help defendant. She went on to have a testy exchange with the prosecutor.[18] The prosecutor asked Karst to identify her wife, and she did so. He also elicited that her wife was in the courtroom, that her wife had been in the courtroom on some of the days of the trial, that her wife was also a friend of defendant, and that her wife had been listening to the testimony and taking notes. Karst insisted that her wife had not shared with her any of the witness testimony or anything that had happened in the courtroom, though she had told Karst who else had been in the audience.

After the close of evidence but before closing arguments, Juror No. 1 was excused because she had an interview on the following Monday for medical school that could not be rescheduled. When she was leaving the courtroom after being excused, the prosecutor followed her and asked for her phone number, which she provided. He said, "he wanted

---

[18] The trial court observed that "[t]here's a little bit of energy here that's probably not healthy" and directed everyone to "take a little bit of breath right now."

to talk to me about the case" and would call her later that evening to obtain her "impressions of the trial."

When he called her that evening, they talked for "[l]ess than an hour" about "most" of the witnesses, focusing largely on the complaining witnesses, and her "general opinions of them." The prosecutor asked her "about each of the witnesses that testified at the trial" and asked whether she "thought each witness was credible or not." She "answered his questions and provided him with the information he requested."

One of the witnesses they discussed was Karst. Excused Juror No. 1 was "a little suspicious" of Karst's testimony because "it seemed like she had some prior knowledge of what had gone on in the courtroom . . . ." Excused Juror No. 1 thought Karst's wife, who had been sitting in the courtroom, had been sharing her notes with Karst. Excused Juror No. 1 believed Karst was biased and had been "coached." However, excused Juror No. 1 did not recall telling the prosecutor about her opinion of Karst.[19] Excused Juror No. 1 also texted the prosecutor to challenge defendant's trial counsel's suggestion that defendant had moved the blanket off of J.K. because it was hot. Excused Juror No. 1 noted that "Santa Cruz is not hot at night even in the summer. Everyone on the jury lives in Santa Cruz and knows that."[20]

During his closing argument, the prosecutor argued to the jury: "One juror noted right away that Ms. Karst, quite frankly, has her own bias, motives, and agendas coming in here. You want to talk about someone that had some honesty issues, that's a lady that was a little hard to believe. She was the only one."[21]

---

[19] Defendant claims that excused Juror No. 1 told a defense investigator that she had discussed Karst with the prosecutor. However, defendant's citation to the record does not support this claim.

[20] However, T.B. testified that the interior of defendant's house was cold due to the air conditioning. (See fn. 8.)

[21] The court had instructed the jury: "Nothing that the attorneys say is evidence."

One of the grounds on which defendant sought a new trial was that the prosecutor's contact with excused Juror No. 1 had violated his constitutional rights. The trial court held an evidentiary hearing on this issue. At the evidentiary hearing, the prosecutor admitted that he had found excused Juror No. 1's "insight" "useful": "Absolutely it was useful." However, "it wasn't really like she was providing me any direct insight into specific witnesses. . . . [I]t was a feel good conversation that she was seeing it the same way I did." His closing argument had already been "mostly written at that point." The prosecutor denied that his mention of Karst in closing argument was based on his conversation with excused Juror No. 1. "I thought that -- as I'm trying to remember now there was a juror question that came in about who was in the audience and then that was how the question developed. And so I believe it came from a juror question that noted, oh, look, Ms. [K]arst has been with this one woman the entire time. I thought that's where it came from." "I think it was a juror question saying that they spotted it but it was definitely not from [excused Juror No. 1]."[22]

After the evidentiary hearing, the court found that "the contact with the excused juror should not have occurred is indeed a violation of the Rules of Professional Conduct." The court nevertheless found that a new trial was not merited because excused Juror No. 1 had no contact with other jurors and there was no "change in tactics or strategy by the prosecutor based upon this contact."

### 2. Analysis

The prosecutor's conduct was indisputably improper. "During trial, a lawyer connected with the case shall not communicate directly or indirectly with any juror." (State Bar Rules of Prof. Conduct, rule 3.5(e); see also former rule 5-320 [replaced by

---

[22] The prosecutor testified: "My memory was it came from a juror . . . I could be wrong." "I could be wrong about the juror question."

24

rule 3.5 in 2018].) "For purposes of this rule, 'juror' means any empaneled, discharged, or excused juror." (Cal. State Bar Rules of Prof. Conduct, rule 3.5(*l*).)

The trial court found that the prosecutor's conduct was improper, and the parties agree. Nevertheless, after a contested evidentiary hearing, the trial court found that the prosecutor's improper conduct was not prejudicial. Defendant argues that the prosecutor's improper conduct was structural error that is per se reversible, while the Attorney General maintains that the improper conduct was not prejudicial.

Defendant's structural error argument lacks merit. His reliance on *Hobson v. Wilson* (D.C. Cir. 1984) 737 F.2d 1 is puzzling. In *Hobson*, a civil case, an excused juror was contacted by one of the plaintiffs' attorneys between the close of evidence and closing arguments. (*Id*. at p. 46.) The excused juror provided the attorney with her opinions about the evidence. (*Ibid*.) The *Hobson* court did not find the error to be structural or to merit per se reversal. Indeed, the court noted "that in the case of an excused juror, rebuttal [of a presumption of prejudice] will be more easily accomplished, and the trial judge will find actual prejudice with less frequency." (*Id*. at p. 48.) The *Hobson* court upheld the trial court's finding that the improper contact was not prejudicial. (*Id*. at pp. 49-50.)

Two United States Supreme Court decisions, *Mattox v. United States* (1892) 146 U.S. 140 (*Mattox*) and *Remmer v. United States* (1954) 347 U.S. 227 (*Remmer*), informed the *Hobson* court's analysis. *Mattox* and *Remmer* both concerned improper contact between a prosecutor in a criminal case and *a sitting juror* during a trial. Neither case concluded that the error was structural or that it merited per se reversal. Instead, in both cases, the United States Supreme Court applied a *rebuttable* presumption of prejudice. "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial,

25

with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (*Remmer*, *supra*, at p. 229; accord *Mattox*, *supra*, at p. 150.)

Defendant clings to his assertion that prejudice analysis is inappropriate, and he repeatedly claims that the prosecutor's improper conduct violated his right to an "impartial jury." No case authority supports his structural error argument, and nothing in the record supports his claim that the prosecutor's improper conduct had any impact on his right to an impartial jury. Excused Juror No. 1 did not serve on the jury that convicted defendant; she was excused before closing arguments. She had already been excused from the jury before the prosecutor contacted her, and it was undisputed that she had not discussed the case with her fellow jurors and had no contact with the trial jurors between her excusal and the verdicts. Consequently, we reject defendant's claim that the prosecutor's improper contact with excused Juror No. 1 was structural error and denied him his right to an impartial jury.

Defendant claims that the standard for reversal should turn on whether the contact was "trivial," but the very cases he cites establish that the actual standard is whether the presumption of prejudice has been rebutted.[23] (*Hobson*, *supra*, 737 F.2d at pp. 48-50; *Remmer*, *supra*, 347 U.S. at p. 229; *Mattox*, *supra*, 146 U.S. at p. 150.) He also maintains that we review the trial court's ruling de novo. We question whether that is the correct standard of review here. We ordinarily deferentially review a trial court's credibility

---

[23] Defendant asserts that reversal is required because the trial court *failed to apply* a presumption of prejudice, but the record contains no indication that the trial court failed to apply the appropriate standard. Indeed, the trial court expressly cited *Hobson*, which applied a presumption of prejudice, when it was explaining its decision that the improper conduct was not prejudicial. In any case, since we would reach the same conclusion applying independent review, the trial court's failure to expressly state that it was applying a presumption of prejudice is of no moment.

determinations in ruling on a new trial motion. (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) Here, the issue of the prosecutor's improper contact with excused Juror No. 1 was raised in defendant's new trial motion and resolved after an evidentiary hearing. In any case, we would reach the same conclusion if we applied de novo review as we reach under a more deferential review standard.

The prosecutor's only opportunity to act on the information he received from excused Juror No. 1 was in making his closing arguments. The prosecutor did testify that he found excused Juror No. 1's comments "useful," but he made it clear that she simply boosted his confidence in his case, rather than providing him with any information that he used to craft his closing arguments. The trial court credited the prosecutor's testimony that his closing argument reference to a juror's assessment of Karst was not based on excused Juror No. 1's comments but on the juror question, and we too find the prosecutor's testimony credible because it is completely consistent with the record.[24] Furthermore, the credibility of Karst's testimony was not an important issue at trial. She was a very weak defense witness testifying about largely tangential issues. We agree with the trial court that the prosecution rebutted the presumption of prejudice based on the prosecutor's improper contact with excused Juror No. 1.

### D. Vouching

Defendant argues that the prosecutor committed misconduct when he "vouched in closing argument that he had not influenced the witnesses during their unrecorded conversations." Defendant's "vouching" claim is directed at a portion of the prosecutor's closing argument in which he was responding to defendant's trial counsel's closing argument assertion that the prosecutor had "interjected himself in this case with his

---

[24] Defendant asserts that the prosecutor's mention of the juror question was improper because it was not in evidence. As there was no objection to this argument and the subject matter of Karst's bias was fully explored during the prosecutor's cross-examination of her, we see no prejudicial misconduct in this regard.

27

questioning method" when he talked to the victims before trial and when he examined them at trial. Defendant characterizes the prosecutor's response to this assertion as "vouching" and "testifying."

### 1.    Background

#### a.    Trial Testimony

J.K. testified that he had only one meeting with anyone in the prosecutor's office, and that meeting was with the prosecutor and his investigator. During that meeting, shortly before the 2016 trial, he told them about the camera and pajama incidents that he had not told the police about during his 2013 interviews.

At trial, S. testified that defendant frequently rubbed S.'s legs "[s]ensually."[25] On cross-examination, defendant's trial counsel questioned him about his use of "the term 'sensual touch'." He asked: "[D]id you use the term 'sensual touch,' having to do with those, [the prosecutor] used it or because you thought those touchings were sensual?" S. responded: "I thought they were." Defendant's trial counsel asked S: "You never used the word 'sensual,' did you?" S. responded: "But that's what they were." Defendant's trial counsel asked: "And the first time you've used the word sensual was after [the prosecutor] did here in court; right?" S. replied "No."

Before trial, R.A. had never mentioned that defendant's penis was erect during the "spooning" incident. On direct examination, R.A. said nothing about defendant's penis having been erect. On cross-examination, responding to a question about whether he had been touched by defendant during the "spooning" incident, R.A. responded: "I do remember him being up along my back side and I felt him like somewhat eject [*sic*]. I did feel something poke me." Defendant's trial counsel asked "Somewhat erect?" R.A.

---

[25] S. denied that his trial testimony was the first time that he had used the word "sensual."

28

said "Yes." Defendant's trial counsel proceeded to ask R.A. if he had ever said this before. R.A. testified: "I said it when I was talking with *them*." (Italics added.)

This colloquy then occurred: "Q. Oh. So was there another time that you talked with the District Attorney which was not recorded? [¶] A. Uh-huh. [¶] Q. Is that correct? [¶] A. One time, yes. [¶] Q. When was that? [¶] A. Last week." Defendant's trial counsel then asked "did you forget to mention erect when you were being recorded?" R.A. responded: "I could have sworn that I said that when I was talking to them." He admitted that the recorded interview, which was with the prosecutor's investigator, did not reflect a mention of "erect." After that recorded interview, he testified that there was an unrecorded interview "with [the prosecutor]."

On redirect, the prosecutor elicited R.A.'s testimony that he could feel defendant's penis when defendant was spooning him. On recross, defendant's trial counsel asked: "The way he just questioned you with the leading questions, is that what he did off tape?" R.A. responded: "Yes." On redirect, the prosecutor asked R.A. if he knew "what a leading question is," and R.A. responded "trying to gather information out of what I'm saying." R.A. testified that the prosecutor had asked "open-ended questions," and he was "not asking leading questions." On further recross, R.A. testified that the memory of feeling defendant's penis had surfaced between the recorded and unrecorded interviews.

### b. Closing Arguments

Defendant's trial counsel made an extensive argument to the jury in which he suggested that the victims "changed their story" "after interviews with [the prosecutor]." "The police do an interview. And then [the prosecutor] does an interview and the story changes from what was told to the police—without a recorder." "[Y]ou'll never know what happened during those interviews . . . ." "[The prosecutor] plants a word, with a suggestion." "There is a pattern in this case of changing of stories after it goes from the police to [the prosecutor]." Defendant's trial counsel asked the jury to compare the prosecutor's "questioning methods" at trial to those of the police. He argued that the

29

prosecutor would have used the same type of questioning "when he is alone and there's no tape." Defendant's trial counsel asserted that "[the prosecutor] interjected himself in this case with his questioning method."

He applied this argument to the testimony of several of the victims. As to J.K., he argued that J.K.'s testimony about the camera and pajama incidents was suspect because he first revealed these incidents to the prosecutor in an unrecorded interview. He argued that R.A.'s testimony about the erection was suspect because R.A. had "changed" his "story" after a "private" interview with the prosecutor. He told the jury: "It changed after meetings, unrecorded, and he then changed to he felt an erection. But what did he originally say? 'He didn't molest me. He didn't touch me. He didn't interact with me.'" As to S., defendant's trial counsel argued at length that the prosecutor, at trial, "introduces the term 'sensual'" and "finally [S.] repeats it back one time."

The prosecutor responded to this attack in his closing argument. "And today, apparently, evil me with my devil horns is coming in here and playing with my lab rats -- which I apologize if anyone got that impression. That wasn't really what I was doing in the slightest." The prosecutor discussed defendant's trial counsel's attack on T.B.'s testimony. "The claims of influence on T[.B.], again, he is asking you to speculate about a witness that didn't show, that you have no evidence about any conversation, and from that you are supposed to infer something. [¶] Here is all I do know: whatever influence that was claimed, T[.B.] denied. There was no changing or controlling of his mind. He didn't become a lab rat that got manipulated. Okay? It was only when he felt comfortable that he said anything. [¶] And the level of accuracy and honesty that he brought to you is evident by the fact that when T[.B.] was asked, was there three or four touchings, he backed off of that. I wasn't in his mind. No one was pressuring him."

Responding to defendant's trial counsel's attack on S.'s testimony, the prosecutor argued: "I know he wants to blame me for the word 'sensual touch.' I am the one that, again, controlled his mind and controlled your mind, and I'm going to take over the

30

universe with my evil powers." The prosecutor argued that, if this had been the first time S. characterized the touching that way, defendant's trial counsel would have impeached him on that point. "Why is he blaming me for it?" "But I guess if the law and the facts aren't on your side, it's kind of bash me. I'm not the boogie man here on this."[26]

### 2. *Analysis*

Defendant argues that the prosecutor "essentially testif[ied] in closing argument . . . that he had not improperly influenced the witnesses," thereby vouching for the credibility of the witnesses.

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.)

Defendant's "vouching" argument is based on a strained and implausible reading of the prosecutor's remarks. We see no vouching whatsoever. The most reasonable reading of the prosecutor's comments is that he was referring to his direct examination of the witnesses *at trial*, not to anything that had occurred at an *unrecorded pretrial interview*.[27] So understood, nothing the prosecutor said was improper. We reject

---

[26] Defendant also challenges as "vouching" the prosecutor's statement, in discussing the camera incident: "I'm here to tell you, there is not a chance [defendant] wouldn't have said, 'That camera was in my bedroom.' No, no, no. [Defendant's trial counsel] literally just invented that story." This statement was a response to defendant's trial counsel's extended argument that someone other than defendant must have taken the camera from somewhere "where it's guarding valuables" and put it in the bathroom as "a prank." In this context, it is clear that the prosecutor's comment, suggesting that defendant would have supported that story, was not any sort of vouching.

[27] Defendant seems to suggest that the prosecutor committed misconduct simply by interviewing the witnesses without recording those interviews. He cites no rule

defendant's strained and unreasonable reading of the prosecutor's comments. Accordingly, we reject defendant's contention on the merits and need not address his ineffective assistance argument.

### E.     R.A.'s Testimony About Defendant's Erection During Spooning

Defendant contends that reversal is required because the prosecutor "failed to correct known false testimony from R.[A.]" about what R.A. had told the prosecutor during an unrecorded pretrial interview.

#### 1.     Background

Before trial, R.A. had never mentioned that defendant's penis was erect during the "spooning" incident. On direct examination, R.A. said nothing about defendant's penis having been erect. On cross-examination, R.A. testified that he felt defendant's erect penis during the "spooning" incident. When asked if he had ever said this before, R.A. said: "I said it when I was talking with them." R.A. admitted that the recorded interview, which was with the prosecutor's investigator, did not reflect that he had mentioned this. R.A. testified that he had mentioned the erection during an unrecorded interview with the prosecutor a week prior to his testimony. R.A. testified: "I could have sworn that I said that when I was talking to them." On redirect, the prosecutor elicited R.A.'s testimony that he could feel defendant's penis when defendant was spooning him. On further recross, R.A. testified that the memory of feeling defendant's penis had surfaced between the recorded and unrecorded interviews. In argument to the jury, the prosecutor mentioned R.A.'s testimony that he had felt defendant's erect penis.

Defendant's new trial motion asserted that either R.A. had testified falsely about the erection or the prosecutor had failed to provide discovery of R.A.'s statement. The prosecutor conceded that R.A. had not told him or his investigator prior to trial that

---

categorically barring a prosecutor from having unrecorded conversations with prosecution witnesses.

R.A. had felt an erection when defendant spooned him.[28]  When R.A. testified at trial about the erection and said he had told the prosecutor about it, the prosecutor was "surprised" because he knew R.A. had not done so.  The prosecutor stated that he "believe[d]" that he told defendant's trial counsel after R.A.'s testimony that R.A. had never told him that.  "I have a belief that I informally discussed the matter with [defendant's trial counsel] at the break.  I do not have a strong memory of that, and could be wrong."  The court found that the prosecutor had not presented false testimony because R.A.'s testimony "could have been a good faith misrecollection," and that testimony was elicited by the defense.

### 2. *Analysis*

Defendant, citing *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*), contends that reversal is required due to the prosecutor's prejudicial "failure to correct R.[A.]'s known false testimony."

In *Napue*, the primary prosecution witness in a murder case was serving a 199-year term for the same murder.  This witness testified on direct examination that he had received no promise of consideration for his testimony.  This was false, and the prosecutor, who elicited this testimony, knew that it was false.  However, he did nothing to correct this false testimony.  (*Napue*, *supra*, 360 U.S. at p. 265.)  The *Napue* court noted that the obligation to correct false testimony applies even when the prosecution does not elicit the false evidence and even when the evidence "goes only to the credibility of the witness."  (*Id.* at p. 269.)  Because the false testimony "may have had an effect on the outcome of the trial," the court held that reversal was required.  (*Id.* at p. 272.)

"Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the

---

[28] The prosecutor testified at the evidentiary hearing that he had talked to R.A. once or twice before trial but did not participate in the recorded interview with R.A., which was conducted by his investigator.

33

evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647.) We independently review whether such an error was prejudicial (*People v. Adams* (1993) 19 Cal.App.4th 412, 427), and the applicable standard is whether the Attorney General has established that the error was harmless beyond a reasonable doubt (*In re Jackson* (1992) 3 Cal.4th 578, 597-598 & fn. 10 (*Jackson*), disapproved on a different point in *In re Sassounian* (1995) 9 Cal.4th 535, 545; *People v. Dickey* (2005) 35 Cal.4th 884, 909 (*Dickey*)).

The Attorney General claims that any error was "forfeited" because defendant did not object to this error as "prosecutorial misconduct" during R.A.'s testimony. The Attorney General's forfeiture argument is meritless. Until the prosecutor admitted in response to defendant's new trial motion that R.A.'s testimony was false, defendant had no basis to object on this ground. We decline to find forfeiture. The Attorney General then argues that no error occurred because the prosecutor did not "knowingly" fail "to correct false evidence." The record is to the contrary. The prosecutor conceded below that he *knew* R.A.'s testimony that he had told the prosecutor prior to trial about the erection was *false*.

The Attorney General attempts to distinguish *Napue* on the grounds that there was no evidence that the prosecutor "knowingly offered perjured testimony." He cites *People v. Vines* (2011) 51 Cal.4th 830 for the proposition that "[m]ere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony." (*Id*. at p. 874.) In *Vines*, the witness's testimony was inconsistent with a prior statement to a third party, so the prosecutor could not have known which of the two statements was false. (*Ibid*.) Here, on the other hand, the prosecutor knew that R.A.'s statement that he had told the prosecutor about the erection was false. The Attorney General's reliance on *People v. Riel* (2000) 22 Cal.4th 1153 is similarly misplaced. In *Riel*, there was a conflict between the testimony of the witnesses, but the prosecutor "did not *know* whether or to what extent Edwards might be lying at trial." (*Id*. at p. 1182.) The prosecutor in this case

34

*admitted* that he *knew* that R.A. had not told him about the erection. Because the prosecutor knew that R.A., a prosecution witness, had presented false testimony, his failure to *correct* that false testimony by ensuring that the jury was informed of its falsity violated defendant's right to due process.[29]

The remaining question is whether the *Napue* error was prejudicial. The Attorney General fails to make any showing that the error was harmless beyond a reasonable doubt because he refuses to acknowledge that this is the applicable standard. He ignores the fact that the California Supreme Court long ago recognized that this is the applicable standard. (*Jackson*, *supra*, 3 Cal.4th at pp. 597-598 & fn. 10.) We proceed to apply this standard.

"[T]he beneficiary of a constitutional error [is required] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) "To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous." (*Yates v. Evatt* (1991) 500 U.S. 391, 403 (*Yates*), disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.) "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." (*Yates*, *supra*, at pp. 403-404.) "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, italics original.)" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621; accord *People v. Neal* (2003) 31 Cal.4th 63, 86.)

---

[29] All that would have been required was a stipulation that R.A.'s testimony was false.

Thus, we must ask whether the jury's verdicts were "surely unattributable" to the prosecutor's failure to correct R.A.'s false testimony. The Attorney General contends that the error was harmless because defendant "had the opportunity to cross-examine and test the witness's credibility and did in fact do so." The problem with this argument is that defendant's ability to "test the witness's credibility" was hamstrung by R.A.'s false testimony coupled with the prosecutor's failure to correct R.A.'s false testimony. Had the jury known that R's claim to have told the prosecutor about defendant's erection prior to trial was false, it might have doubted the reliability of R.A.'s claim that he felt defendant's erection, a claim made for the first time at trial, more than a decade after the spooning incident.

The prosecutor admitted that R.A.'s erection testimony was important evidence. Thus, the *credibility* of R.A.'s erection testimony was likewise important. Like some of the other counts, the spooning count, in the absence of the erection testimony, involved conduct that in and of itself did not necessarily demonstrate a sexual intent. Indeed, defendant's defense to the spooning and other similar counts was that he was not guilty of lewd conduct because he lacked the required sexual intent. The erection testimony provided very strong evidence that he did in fact have the required sexual intent for the spooning count, and it raised a reasonable inference that he harbored the same intent when he had engaged in other similar conduct. Under these circumstances, we cannot say that the jury's verdicts on the spooning count and the other similar counts were surely unattributable to the prosecutor's failure to correct R.A.'s false testimony.

We reach a different conclusion as to five of the counts since these five counts bore no similarity to the spooning count. The evidence of defendant's sexual intent for the acts upon which these five counts were based was so overt that the jury's verdicts on these counts were surely unattributable to the prosecutor's failure to correct R.A.'s false testimony. These five counts are the two counts based on defendant's act of forcing K.C. to orally copulate him, the two counts based on his touchings of T.B.'s penis, and the

36

count based on the final touching of J.K., which was accompanied by defendant masturbating. As to these five counts, the *Napue* error was harmless beyond a reasonable doubt because these counts were not similar to the R.A. count and proof of defendant's sexual intent could not have depended in any way on an inference from R.A.'s erection testimony.

In sum, we conclude that the *Napue* error requires reversal of nine of the 14 counts.

### F.      *Gifts to Victim T.B.*

Defendant contends that reversal of the remaining counts is required because the prosecutor failed to disclose to the defense that an employee of the District Attorney's office had given T.B. a laptop computer and a gift card.[30]

#### 1.      *Background*

T.B. testified at an Evidence Code section 402 hearing on August 16, 2016 and at trial on August 18, 2016. While he was in the victim-witness area of the District Attorney's office waiting to testify on those days, T.B. spent some of his time taking apart and putting back together an old broken laptop. He asked if there were any games he could play or an old laptop he could borrow to pass the time.

Brian Airoldi, a claims specialist who worked for the California Victim Compensation Board in the District Attorney's office, often interacted with victim-advocates in the District Attorney's office. He was aware that Michelle Cardinale was T.B.'s advocate. Sylvia Nieto was the supervisor of both Airoldi and Cardinale. Airoldi heard some of the advocates talking about T.B. and saying that T.B.'s laptop was broken.

---

[30] Defendant raised this issue in his new trial motion, and the trial court held an evidentiary hearing on it.

On August 16, 2016, Cardinale asked Airoldi if "we could maybe refurbish" an old laptop computer to give to T.B. because his laptop was broken. Airoldi asked Nieto if it was okay to do so. Both Nieto and Cardinale told Airoldi not to say anything to T.B. or give him anything until after T.B. was done testifying. Airoldi tried to fix two old laptops they had in the office, but those laptops turned out to be too obsolete to be refurbished. Airoldi asked Nieto if he could give T.B. an old personal laptop, which he had been planning to donate to charity. He also informed Cardinale of this plan.

On August 18, 2016, before T.B. was done testifying, he was told that "there was a laptop being fixed up for me" to borrow. When T.B. was done testifying, Cardinale told him that he "did a good job," "helped a lot of people," and was "helping other children." She told him "as long as I tell the truth, that's the only thing that they want is for me to tell the truth."

After Cardinale told Airoldi that T.B. was done testifying, Airoldi gave T.B. his old personal laptop. Airoldi had not spoken to T.B. about the laptop before Airoldi gave T.B. the laptop. When he gave T.B. the laptop, he talked to T.B. for five to 10 minutes. T.B. "wanted to play games on it," so Airoldi went out and bought T.B. a $50 gift card so he could buy games for the laptop. Airoldi gave T.B. the laptop and the gift card in the late afternoon, and Airoldi understood that T.B. had finished testifying earlier that day.

T.B. did not know that he would be able to keep the laptop until after he was done testifying. No one told him until he was done testifying that the laptop they were fixing up for him to use would be for him to keep. Until then, he believed that a laptop was being fixed up just for him to temporarily use. T.B. testified that he was "happy" to get the laptop but "[e]ven if I didn't get that laptop," what mattered to him was "that I helped people." T.B. testified that he also received "witness fees," less than $100, for testifying. He did not learn of these fees until after he was done testifying.

The prosecutor testified at the evidentiary hearing that he knew nothing about the laptop given to T.B. The court found that the gifts had no impact on T.B.'s testimony and that there had been no violation of the prosecutor's disclosure obligation.

### 2. Analysis

Defendant argues that the prosecutor's failure to disclose to the defense the gifts to T.B. violated the prosecution's obligation to disclose material favorable evidence to the defense.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady v. Maryland* (1963) 373 U.S. 83, 87.) "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (*Kyles v. Whitley* (1995) 514 U.S. 419, 433.) "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " (*Id*. at p. 434.) Evidence is not material if "it would have added little to the cumulative impact of the other impeachment evidence." (*Dickey*, *supra*, 35 Cal.4th at p. 908.)

Defendant has failed to persuade us to that evidence that T.B. was given an old laptop and a $50 gift card after he had finished testifying would have added anything to "the cumulative impact of the other impeachment evidence." T.B. was impeached with evidence that he had initially repeatedly denied that defendant had molested him, considerable evidence that he had a history of mental health issues, including hallucinations, his admission that he had previously suggested that his mother had

sexually molested him, and his admission at trial that he had a "history of lying." The gifts truly would have "added little to the cumulative impact of this other impeachment evidence."

Nevertheless, defendant claims that the gift evidence would have "provided a selfish motive for T.[B.] to testify—for personal monetary gain." We see no materiality here. T.B.'s testimony was consistent with his several prior statements, made long before he had been offered or received any gifts. Defendant does not explain how gifts that had never been mentioned to T.B. previously and were given to T.B. on the day of his trial testimony could have influenced his trial testimony, which was entirely consistent with his prior statements detailing defendant's molestation of him. We reject defendant's contention concerning the gifts to T.B.

### G.     *Victim T.B.'s Fresno County Arrest*

Defendant claims that reversal is required because the prosecutor failed to fully disclose information about the circumstances surrounding T.B.'s arrest for theft, his being charged with theft, and the dismissal of the theft charge in Fresno County the month before T.B. testified at trial. He also contends that his trial counsel was prejudicially deficient in failing to further investigate and present such evidence to impeach T.B.'s testimony.

#### 1.     *Background*

On July 6, 2016, 13-year-old T.B. was arrested in Fresno County for stealing an expensive purse from his foster mother's niece. He had also stolen jewelry from his foster mother. T.B. admitted to the police that he had taken the purse. Two days later he was charged by a Fresno County juvenile petition with felony grand theft (§ 487, subd. (a)). On July 25, 2016, the Fresno County juvenile court dismissed the petition at the request of the probation department and released T.B. to a Santa Cruz County social worker with the direction that he was to remain under dependency jurisdiction. When the prosecutor learned before trial about the Fresno County case from a Santa Cruz County

40

social worker, he informed defendant's trial counsel of T.B.'s "outstanding theft case" in Fresno.

On August 16, 2016, during trial, defendant's trial counsel told the court that T.B. "was recently arrested and we don't know what for and we have to look at whether or not there is evidence that would be admissible for impeachment purposes." The prosecutor stated "I disclosed that to counsel" and asserted that he had offered to agree to a pretrial continuance but had been turned down.

T.B. testified at an Evidence Code section 402 hearing on August 16, 2016, but there were no questions about his arrest. T.B.'s trial testimony occurred on August 18, 2016. T.B. admitted on cross-examination that he "had a history of lying."[31] Defendant's trial counsel did not ask T.B. about his arrest.

In his new trial motion, defendant asserted that his trial counsel had been prejudicially deficient in failing to raise issues about T.B.'s theft arrest as impeachment at trial. The trial court found that the jury's rejection of the other strong challenges to T.B.'s credibility meant that trial counsel's decision not to present the theft evidence was reasonable.[32] The court also found no evidence that T.B. had received favorable treatment in the Fresno County case.

### 2.    *Analysis*

Defendant claims that the prosecutor breached his disclosure obligations by failing to "obtain and review" T.B.'s juvenile file and "provide the exculpatory information" about T.B.'s "multiple recent felony thefts and lies to the police" to defendant's trial counsel. He acknowledges that the prosecutor informed defendant's trial counsel of

---

[31] Defendant's trial counsel also tried to suggest that T.B.'s testimony had been influenced by the prosecutor. He argued to the jury: "I asked [T.B.] what he was talking about when he and [the prosecutor] met. And he said: 'I'm not answering that.' And immediately, [the prosecutor] asked for a break, just boom, right then."

[32] No evidentiary hearing was held below on this claim.

T.B.'s arrest and argues that his trial counsel was prejudicially deficient in failing to investigate further and use this information to impeach T.B. at trial.

Defendant ignores the fact that the prosecutor could not have disclosed information in a juvenile file to the defense. The prosecutor acknowledged in his declaration below that he was "concerned that I might not be authorized to disclose" even the information that T.B. had been arrested, but he disclosed that information because he knew it was potential impeachment evidence. Juvenile case files are protected from disclosure by Welfare and Institutions Code section 827 and may be disclosed only if a petition for disclosure is granted. (Welf. & Inst. Code, § 827, subds. (a)(1)(Q), (a)(4), (e).) Thus, the prosecutor *could not have* disclosed anything further to the defense. (*People v. Stewart* (2020) 55 Cal.App.5th 755, 773, 776.) Instead, the prosecutor fulfilled his obligation by informing defendant's trial counsel of the existence of the impeachment evidence. "[T]he government's *Brady* obligations with respect to juvenile records are satisfied if the prosecutor informs the defendant that there is *Brady* material in the relevant files and the defense can then avail itself of juvenile court review of the relevant files under section 827 to identify and turn over to the defense any exculpatory or impeachment material." (*Id*. at p. 774.) By telling defendant's trial counsel of T.B.'s arrest and offering to stipulate to a continuance, the prosecutor complied with his disclosure obligations. (*Id*. at pp. 774-776)

Defendant also claims that his trial counsel was prejudicially deficient in failing to further investigate and use T.B.'s arrest to impeach T.B.'s testimony. "To succeed on an appellate claim of ineffective assistance, a defendant must establish that his trial counsel's performance was deficient and that his defense was prejudiced by the deficiency. [Citations.] 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.] Whenever counsel's conduct can be reasonably attributed to sound strategy, a reviewing court will presume that the conduct was the result of a competent

tactical decision, and the defendant must overcome that presumption to establish ineffective assistance. [Citation.]" (*People v. Fromuth* (2016) 2 Cal.App.5th 91, 113.) "It is not deficient performance for a criminal defendant's counsel to make a reasonable tactical choice." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The record in this case does not establish that it was an unreasonable strategic choice for defendant's trial counsel to decide not to pursue further investigation of T.B.'s arrest for theft. Defendant's trial counsel chose to concentrate his impeachment of T.B.'s testimony on T.B.'s history of lying and hallucinations. Evidence that 13-year-old T.B. had stolen from his foster mother and her niece would not have added anything of significance to this impeachment. For the same reason, defendant cannot establish that his trial counsel's choice was prejudicial. Our confidence in the outcome is not shaken by the absence of this impeachment evidence, which was minor in comparison to the other evidence used to impeach T.B.

### H. References to Defendant's Relationships

Defendant asserts that the prosecutor erroneously argued that defendant was sexually attracted to children because he lacked any "*heterosexual* relationships." He argues that linking his sexual orientation to his motivation to commit the charged offenses was federal constitutional error. Defendant claims that his trial counsel was prejudicially deficient in failing to object to these arguments.

The problem with this argument is that the prosecutor did not target defendant's lack of "*heterosexual* relationships" or link defendant's intent to his "sexual orientation." (Italics added.) Instead, from the very start, in the prosecutor's opening statement, it was clear that the prosecutor was actually highlighting defendant's lack of "*any kind of significant adult relationship*." (Italics added.) When the prosecutor questioned witnesses, he asked if defendant had "an intimate partner relationship *with a man or a woman*." (Italics added.) He asked witnesses if defendant had "any consistent adult company" or "an adult relationship," "*male or female*." (Italics added.) He asked

43

whether a neighbor had seen "a romantic adult girlfriend" or "a romantic adult male partner" regularly visiting defendant at his home. The prosecutor questioned defendant's adopted son, Charlie, about whether defendant had been "in a dating relationship" with "any man" or "any woman" or "any kind of adult romantic relationship" during the 22 years Charlie had known defendant. The prosecutor never suggested that defendant's lack of "heterosexual" relationships was at issue or that his sexual orientation was relevant. He directed his attention only to defendant's lack of *any* male or female adult romantic relationship.[33]

The only times that the prosecutor mentioned "heterosexual" relationships was when he argued that defendant had expressly represented himself to the parents of the children as "a heterosexual male" and to the police by claiming that Peters was his girlfriend. "Of course, there's lies about his heterosexuality. . . . " "Literally from the word go with the police, he's ready to use the same lies of I have a heterosexual background. I'm heterosexual. I like women. Your belief that I like boys is just unfounded." Except for those specific references to defendant's explicit claims that he was heterosexual, the prosecutor limited his argument to defendant's lack of "an adult *male or female* relationship in, like 25 years." (Italics added.) "[A] consistent pattern . . . since 1985" of "[n]o adult relationships." (Italics added.)

Defendant's argument founders on the lack of record support for his claim that the prosecutor targeted his *sexual orientation*. The prosecutor's questioning and argument were addressed to defendant's lack of any male or female adult sexual relationships. Defendant does not suggest that the prosecutor was not permitted to address defendant's lack of any adult sexual relationships. Nor does he explain why it would be improper for the prosecutor to highlight defendant's repeated false representations that he had been or

---

[33] Defendant's trial counsel followed suit by asking one of defendant's friends if he had ever been aware of defendant having "a girlfriend or boyfriend."

was currently involved in adult heterosexual relationships. These arguments were aimed at the motivation for defendant's lies, not at defendant's sexual orientation. Since defendant has failed to show that the prosecutor engaged in any impropriety in this regard, defendant's trial counsel's failure to object was not a deficiency.

## I.        *Use of the Word Pedophile*

Defendant claims that "the prosecutor erred by eliciting inadmissible lay testimony opining that [defendant] was a 'pedophile,' after the trial court had excluded such evidence and after the prosecutor had assured the court that he would caution witnesses not to use such language." He asserts that his trial counsel was prejudicially deficient in failing to object to the "pedophile" references.

### 1.        *Background*

Defendant sought an in limine ruling that "the use of the term pedophile should be excluded" under Evidence Code section 352. The prosecutor brought an in limine motion concerning two parents who allegedly tried to stop defendant from seeing their children. Defendant's trial counsel responded: "The only thing I'm concerned with is the inflammatory language. These people use inflammatory language. You know, they love the pedophile word ever since everything was used in the newspaper. I would just think that -- your observations I have no problem. I don't know if he's attempting to introduce them as negative character or not." The prosecutor responded: "In direct examination I was never intending for them to use the word pedophile or elicit their, quote, opinions about [defendant]'s interest in boys in general."

The court stated: "I mean I agree with [defendant's trial counsel]. I don't think there should be inflammatory material in terms of people [using] the term pedophilia or pedophile. I am concerned about lay opinion testimony." Defendant's trial counsel expressed concern that the parents be limited to "facts." "Her [(one of the parents')] rational[e] I think we are going down a slippery slope because they might not use the word pedophile but he is a sicko. That's another one that they use." The court

45

responded: "Well, I don't want to hear anything like that and I don't think [the prosecutor] would ever elicit that and I think -- well, I know [the prosecutor] is going to advise these witnesses not to use information like that." The prosecutor affirmed "I have by the way."

After a lengthy discussion about proposed testimony by Buckingham, the court ruled: "There's going to be no inflammatory lay opinion. There's going to be no reference to pedophilia or being a pedophile. She's going to be able to testify that I had a concern. If counsel want to work out a different verb for that or a different noun for that, that's fine, but I'm concerned about the manner in which [defendant] showed interest in my child. She then is going to be able to testify as to what she did and as to the response by [defendant]. That's Ms. Buckingham." The trial court voiced concern about the scope of testimony by parents of children who were not alleged to have been molested, and the prosecutor responded: "I've read a lot of [defendant's trial counsel]'s motions about don't call people pedophiles and I'm not going to -- that's not what's happening here. I'm going to keep the game -- I'm sorry keep the testimony of them very simple."

The court made clear that this discussion concerned Buckingham and "Ms. Davis." The court stated: "[T]here is a concern as to testimony of a conclusionary nature as to pedophilia, pedophile. We're not going to have that type of inflammatory information." Later, in connection with a group of witnesses who were going to testify about their observations of defendant at the Chaminade pool, the court said: "I don't think it's appropriate for a witness to use a term like he preyed on someone. I think that's improperly conclusionary and inflammatory in nature."

Some pedophile references occurred at trial, but defendant's trial counsel did not object to any of them. Defendant sought a new trial based on pedophile references. He submitted his trial counsel's declaration in support of his motion. Defendant's trial counsel declared that he understood that the court and the prosecutor had agreed that no pedophile references would occur after he brought his in limine motion. He asserted that

46

he had no strategic reason for limiting his request to Buckingham and Davis. Defendant's trial counsel declared that he believed that his in limine motion was adequate to preserve his objection. He claimed that he had no strategic reason for failing to object to the pedophile references.

The trial court rejected this claim. It found that "part of the defense strategy was to allow witnesses to offer testimony and to then attempt to undermine what may have been perceived as over reactions or non meritorious concerns by those witnesses."

### 2. Analysis

Defendant asserts that the prosecutor "repeatedly elicited" lay opinion testimony that defendant was a pedophile. The *only* pedophile references he identifies as the foundation for this claim are a few references in testimony by S. and S.'s mother, none of which were objected to by defendant's trial counsel.[34]

S. used the word "pedophile" three times. He testified that after he found the camera in the bathroom "it was just the last straw, where I realized that he is a pedophile." About two weeks later, he told his mother about the camera "and that I was pretty sure that he was a pedophile." S. also testified that he felt "guilt" for getting his friends involved with defendant "once I realized that he was pedophile." None of the prosecutor's questions sought any opinion testimony from S.

---

[34] The word "pedophile" could not have been banished from this trial because it was relevant to issues about the searches on defendant's computer. The prosecutor asserted in his opening statement, without objection, that between March and August 2013, defendant "is searching on his computer for the term pedophile." "He is searching the term pedophile. He's actually going to self help sites searching pedophile. He is looking at articles talking about the treatment of pedophilia." The defense claimed that these searches had been done by someone other than defendant. Hence, the defense was motivated to show that other people who had been in defendant's home used the term "pedophile." This explains why defendant's trial counsel elicited multiple pedophile references during his cross-examination of J.K., including that J.K. thought "[defendant] was repressing he was a pedophile."

47

After these three references, the prosecutor asked S.: "You've been using the word 'pedophile.' You felt violated about it. Why not just go to the police and say, 'This is it'?" S. explained that he was "under so much mental stress" and "wanted to kill myself," and he "couldn't deal with it at the time." Since it was clear that S.'s pedophile references were not opinion testimony but simply his means of describing his experience of being abused by defendant, we can see no basis for finding that defendant's failure to object to these references was either deficient or prejudicial. No reasonable juror would have taken S.'s pedophile references to reflect an opinion on defendant's status rather than as a factual description of S.'s personal experiences with defendant.

S.'s mother also used the word pedophile several times in her testimony. When the prosecutor was asking her about her confrontation with defendant, he inquired whether she had asked defendant if he was sleeping in the same bed as S. She replied: "I don't think I actually came out and said that. Then the whole thing came up, that I was concerned that maybe [defendant] was a pedophile and I asked him point blank to his face, 'Should I call the police? Should I be worried about this?' " She testified that defendant "looked at me straight in the eye and said, 'If you feel that that's what you need to do.' " None of the prosecutor's questions sought opinion testimony. After this testimony, the prosecutor asked her: "He denied being a pedophile; right?" S.'s mother said "Of course." The prosecutor then asked her about her discussions with S. around the same time. She testified that she was concerned that "maybe I'm overreacting. I'm not a pedophile, so . . . I'm just kind of confused by the whole thing . . . ." She wanted to find out from S. whether S. " 'want[ed] to go back and hang with [defendant].' " S.'s mother testified that she was concerned about "whether or not [defendant] is a pedophile or was a pedophile. I was confused about what to do." Again, none of the prosecutor's questions sought opinion testimony.

We can see no basis for a finding that defendant's trial counsel was prejudicially deficient in failing to object to these pedophile references. This was not lay opinion

48

testimony. S.'s mother did not express the opinion that defendant was a pedophile. She instead testified only about her concerns based on what she had been told by S. No reasonable juror would have understood this testimony to express S.'s mother's opinion that defendant was a pedophile, since she expressly stated that she did not know whether he was or was not.

We reject defendant's claim that his trial counsel was prejudicially deficient in failing to object to these pedophile references. We also reject his argument that the prosecutor acted improperly, as none of his questions sought such references or any opinion testimony from either S. or S.'s mother.

### J.    Timing of the Release of The Borrowers Movie

Defendant contends that his trial counsel was prejudicially deficient because he failed to present evidence at trial that the movie The Borrowers was not released until February 1998, though K.C. testified that defendant abused him in 1997 after they went to see The Borrowers movie.

#### 1.    Background

K.C. testified at trial that, when K.C. was eight years old and in third grade, he went with Charlie and defendant to "see a movie that had just come out called The Borrowers." At trial, K.C. accurately described the plot of the Borrowers. During cross-examination of K.C., defendant's trial counsel asked K.C. if he had been in third grade "in '97, '98 or '96, '97?" K.C. responded: "I don't know." Defendant's trial counsel then asked: "Did The Borrowers come out after that, after the time you claimed you were molested?" K.C. responded: "We saw the movie before the incident." K.C.'s mother testified that K.C. was eight or nine years old at the time that he interacted with defendant. K.C. was nine years old in February 1998.

Defendant's trial counsel mounted a strong attack on K.C.'s testimony. He presented evidence intended to show that K.C.'s LSD consumption when he first disclosed the molestation could have altered K.C.'s memories. He pointed out that K.C.

49

had not told the police about his LSD use initially, and that K.C. had drunk hard alcohol on several of the occasions when he disclosed the molestations. Defendant's trial counsel adduced testimony that K.C. had told his friend, when he first disclosed the molestation, that the molester was a neighbor, but defendant was not K.C.'s neighbor. Charlie testified that he had never known K.C. or been to a movie with him. Defendant's trial counsel adduced a great deal of testimony aimed at establishing that K.C.'s description of defendant's house and of how he came to know Charlie were inaccurate. And he highlighted the inconsistency between the nature of the acts described by K.C. and the nature of the acts described by the other victims.

Defendant's new trial motion asserted that the movie The Borrowers was not released in the United States until February 1998, and it was not shown in Santa Cruz until February 1998. The court found that evidence of the release date of the movie would not have made any difference because K.C.'s testimony had been "thoroughly and consistently attacked."

### 2. Analysis

Defendant concedes that his trial counsel made a strategic decision not to present this evidence. He claims only that this decision was "unsound." We disagree.

Defendant's trial counsel could have reasonably decided that diverting jury attention to this minor timing misrecollection would detract from his other more substantive attacks on the reliability of K.C.'s testimony based on the impact of K.C.'s LSD and alcohol use on the accuracy of his memories, his friend's recollection that K.C. described the molester as his neighbor, Charlie's testimony that he had never known K.C., and defense allegations that K.C. had inaccurately described the location of the molestation. Defendant's trial counsel could have concluded that evidence of K.C.'s misrecollection of the precise timing 18 years after the event was trivial and unworthy of presentation to the jury.

50

Defendant makes much of the fact that the information charged that the K.C. counts occurred in 1997. The information actually charged that these counts occurred "[*o*]*n or about* or between 01/01/1997 and 12/31/1997." (Italics added.) " 'The law is clear that, when it is charged that an offense was committed "on or about" a named date, the exact date need not be proved unless the time "is a material ingredient in the offense" (Pen. Code, § 955), and the evidence is not insufficient merely because it shows that the offense was committed on another date.' " (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022.) Here, the "on or about" charging did not require the prosecution to prove that the K.C. counts actually occurred in 1997, rather than a couple of months later. We reject defendant's contention.

### K.        Instruction on Eyewitness Certainty

Defendant contends that the trial court prejudicially erred when it instructed the jury that "[i]n evaluating identification testimony" it should "consider" "[h]ow certain was the witness when he or she made the identification." Although he claims that this instruction was prejudicial as to the K.C., T.B., and J.K. counts, he does not identify *any* testimony by K.C., T.B., or J.K. concerning "[h]ow certain" they were of their identification of defendant as their molester. Thus, even assuming that this instruction was erroneous, it had no application to the testimony in this case, so it could not have been prejudicial to defendant.

### L.        Cumulative Prejudice

Defendant claims that we should reverse due to cumulative prejudice. However, except for the *Napue* error that requires reversal of nine counts, we have found no other significant errors that caused any prejudice. Consequently, we reject his cumulative prejudice argument.

### M.        Failure to Instruct on Multiple Victims Circumstance

Defendant contends that the jury's finding on the multiple victims circumstance must be reversed because the trial court failed to instruct on it.

### 1.    *Background*

CALCRIM No. 3181 is the pattern instruction that addresses a charged multiple victims circumstance allegation:  "If you find the defendant guilty of two or more sex offenses, as charged in Counts ___, you must then decide whether the People have proved the additional allegation that those crimes were committed against more than one victim in this case.  [¶]  The People have the burden of proving this allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that this allegation has not been proved."  (CALCRIM No. 3181.)

The trial court did not instruct the jury with CALCRIM No. 3181 or give any other instruction on the multiple victims circumstance allegation.  Nevertheless, the jury returned a verdict form on the multiple victims circumstance:  "We, the jury in the above-entitled case, having found the defendant guilty of felony offenses in violation of Penal Code section section [*sic*] 288 subdivision (a), as described in Penal Code section 667.61 (c) , find the special allegation that the defendant committed an offense against more than one victim, to be TRUE pursuant to Penal Code Section 667.61 (b) (c) (e)."

In his new trial motion, defendant challenged the multiple victims circumstance on the ground that the court had failed to instruct on it, but the court found the error harmless.  It concluded:  "The jury understood that there were a series of verdicts that they had to evaluate separate and distinct from each other.  The jury understood that the verdicts were separately laid out regarding each of the complaining witnesses.  The jury came to a conclusion that there were multiple victims involved in the series of events that they were presented with.  The jury was instructed that the burden of proof regarding all aspects and assertions by the People was beyond a reasonable doubt.  So from the Court's perspective I don't see an issue that presents traction for purposes of a new trial . . . ."  "[T]he jury clearly filled out various verdict forms which describe each alleged victim by name.  There was no confusion as to the jury's findings regarding multiple victims."  "[T]his Court finds that it was harmless error pursuant to the Jones and Marshall

52

opinions. The jury knew of allegations involving several alleged victims and received verdicts including each victim by name. The jury clearly understood the number of victims and came to clear unambiguous verdicts."

### 2. Analysis

Defendant contends that the court's failure to instruct on the multiple victims circumstance was a "structural" error that requires reversal per se. Yet he identifies no basis for deeming this instructional error structural. The multiple victims circumstance was properly charged, and the jury returned a proper verdict on it. The verdict form itself required the jury to make precisely the findings that the instruction would have required it to make. We can see no basis for finding the error structural.

He argues that even if the error is subject to harmless error review it was prejudicial because some of the counts related to pre-September 2006 conduct. The only count that we are not ordering vacated due to the *Napue* error that relates to pre-September 2006 conduct is the section 288 K.C. count.[35] Defendant separately contends that the multiple victims circumstance finding was invalid as to that count because section 667.61 was amended in September 2006. We address that contention in the next section of the opinion. He makes no other claim that the trial court's instructional error was prejudicial, and we conclude that it was not. The very simple instruction omitted by the trial court would not have required the jury to do anything more than the verdict form required it to do. The trial court's error was harmless beyond a reasonable doubt.

---

[35] The other K.C. count was an aggravated sexual assault on a child count, not a section 288 count, and the multiple victims circumstance did not apply to it.

### N. *Ex Post Facto*

Defendant claims that the multiple victims circumstance violated ex post facto as to counts that charged acts that occurred prior to September 20, 2006. The only remaining count that meets this description is the section 288 K.C. count.[36]

In 1998, section 667.61 applied to "[a] violation of subdivision (a) of Section 288, unless the defendant qualifies for probation under subdivision (c) of Section 1203.066." (Stats. 1997, ch. 817, § 6.) At that time, section 1203.066 barred probation for "[a] person who is convicted of violating Section 288 or 288.5 when the act is committed by the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." (Stats. 1997, ch. 817, § 13.) And section 1203.066, subdivision (c) did not provide for any exception to that probation bar. (Stats. 1997, ch. 817, § 13.)

Here, the jury convicted defendant of the aggravated sexual assault K.C. count. The instructions on that count required the jury to find that defendant had committed the act "by force, fear or threats." Since the aggravated sexual assault count and the lewd act count on K.C. were based on the same act, the jury's verdict on the aggravated sexual assault count precluded defendant from having qualified for probation under former section 1203.066, subdivision (c). Consequently, the multiple victims circumstance properly applied to the lewd act K.C. count. We reject defendant's contention.

## IV. DISPOSITION

The judgment is reversed. On remand, the court shall vacate the jury's verdicts on counts 1, 2, 3, 10, 11, 16, 17, 18, and 20, and it shall permit the prosecutor to elect whether to retry defendant on those counts. If the prosecutor declines to retry those counts, the trial court shall resentence defendant on counts 5, 7, 9, 12, and 13.

---

[36] The T.B. and J.K. counts that survive our reversal occurred in 2016.

_____
ELIA, J.

WE CONCUR:



_____
GREENWOOD, P.J.



_____
BAMATTRE-MANOUKIAN, J.




*People v. Weissman*
H045863